Filed 1/12/15  P. v. Patino CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>SALVADOR JACOBO PATINO,<br><br>      Defendant and Appellant. | F065528<br><br>(Super. Ct. No. BF137376)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Michael E. Dellostritto, Judge.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Michael Dolida, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Salvador Jacobo Patino was convicted of first degree murder, attempted murder, participation in a criminal street gang, possessing methamphetamine, and two counts of being a felon in possession of a firearm.  In this appeal, he argues (1) the prosecutor

contravened *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*) by questioning him about his postarrest silence regarding his claim of self-defense; (2) the prosecutor contravened *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*) by questioning him about his failure to testify at the preliminary hearing; and (3) the single fact that he killed a victim was used to support both the conviction of murder and a sentence enhancement for causing death by using a firearm, resulting in an improper conviction of both a greater and a lesser-included offense and a violation of double-jeopardy principles.

We conclude that no *Doyle* error has been shown. Any *Griffin* error was invited by defense counsel's own questioning of Patino, and the issue consequently is waived. Patino concedes that the California Supreme Court has rejected the lesser-included-offense/double-jeopardy argument he makes; he raises the issue only to preserve it for subsequent review.

The parties agree that the trial court made a mathematical error pertaining to Patino's custody credits. We will order the error corrected and affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

The district attorney filed an information charging Patino with six counts: (1) premeditated murder of Marcus Williams (Pen. Code, § 187, subd. (a));[1] (2) attempted murder of Willie Lawrence King (§§ 187, subd. (a), 664); (3) active participation in a criminal street gang (§ 186.22, subd. (a)); (4) being a felon in possession of a firearm on June 18, 2011 (former § 12021, subd. (a)(1)); (5) possessing methamphetamine (Health & Saf. Code, § 11377, subd. (a)); and (6) being a felon in possession of a firearm on June 25, 2011 (former § 12021, subd. (a)(1)). In count 1, the information alleged that Patino committed the murder while he was an active member of a criminal street gang and committed it to further the activities of the gang (§ 190.2, subd. (a)(22)). In counts 1 and 2, the information alleged that Patino committed the crimes to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)) and that he

---

[1]Subsequent statutory references are to the Penal Code unless otherwise noted.

2.

discharged a firearm resulting in great bodily injury or death (§ 12022.53, subd. (d)). In counts 1 through 3, the information alleged that Patino personally used a firearm (§ 12022.5, subd. (a)). The information alleged in counts 2 and 3 that Patino inflicted great bodily injury (§ 12022.7). In each count, the information alleged that Patino had two prior convictions (§ 667.5, subd. (b)).

Patino pleaded guilty to counts 5 and 6 and admitted the prior convictions. The remaining charges were tried by jury.

At trial, Caesar Vargas Diaz testified that he was living in the front house at 1011 Flower Street in Bakersfield on June 18, 2011. Patino lived in the back house. About 10:00 that night, Diaz was outside his house and saw Patino's father run into the yard from the alley and tell Patino that "two gang bangers" had beaten him up. Patino ran out of the yard, through the alley, to the street. To see what would happen, Diaz followed at a distance of 15 or 20 feet.

In the street, Patino encountered two black men, one with a bicycle. Diaz recognized one of the men as Marcus Williams. Diaz heard Patino ask them something about his father. Patino argued with them for less than a minute. Then Patino drew a black revolver from his waistband and fired six shots in rapid succession. Diaz saw the two men run away in different directions. Diaz did not see them getting shot, but he did go back outside a short time later and he saw Williams collapsed on the ground. A few minutes after the shooting, Diaz saw Patino's brother, Jesse, and heard him shout the word "Florencia." Florencia 13 is the name of a street gang in Los Angeles. In the days following the shooting, Diaz received threatening voice mail messages from Patino. Within days, the district attorney's office relocated Diaz to another county.

Williams was transported to a hospital. A doctor who treated him testified that he arrived with three wounds on the front of his body and two on the back. He died the morning after the shooting. A bullet found lodged in Williams's leg was preserved as evidence. The other victim, King, had been shot in the leg, but he did not cooperate with police. He refused medical treatment and left the scene on his bicycle.

3.

A police officer testified that he arrested Patino on June 24, 2011. Patino had a loaded handgun in his pants pocket. The gun was examined at a laboratory and found to be the gun that fired the bullet taken from Williams's leg.

Evidence of Patino's gang associations was presented. He bore tattoos reading "Anybody Killer," "F 13," "13," "85th Street," "Fuck CDC," "Florencia," "F," and "southside," among others. Patino admitted he was a member of Florencia 13 in Los Angeles, but said he was no longer active. He was known by the monikers Raskal, Chava, and Tiny. When in custody, Patino stated he was a Sureño gang member and should be housed away from Norteños. Patino's brother Jesse was known as Lil' Raskal and had said, when in custody, that he was a Sureño and should be housed away from Norteños. A police expert opined that Patino and his brother were active Sureños on the day of the shooting. The expert also opined that a hypothetical crime, based on the facts of the case, would be committed for the benefit of a gang.

Patino testified on his own behalf. He said that, on the day of the shooting, he was in the yard with Diaz, who was trying to sell him some drugs and a gun. Patino's father came running into the yard and said he had been beaten and robbed. Patino ran to see the people who had done this. He saw a man with a bicycle and asked why he had beaten Patino's father. The man "snapped" and "went crazy" and said he would kill Patino. He appeared to be on drugs. The man pulled a gun from this waistband and advanced toward Patino. Patino "panicked." In his pocket, he had the gun Diaz had been trying to sell him. Then Patino saw another man running toward him. Patino drew Diaz's gun and fired at the ground. The two men kept coming. Fearing for his life, Patino fired at them. He was trying to protect himself and did not intend to kill.

The jury found Patino guilty of all four remaining counts, found that the murder and attempted murder were committed with premeditation and deliberation, and found all the firearm and great-bodily-injury-enhancement allegations true. The jury found not true the gang special-circumstance allegation on count 1 and the gang enhancement allegations on counts 1 and 2.

4.

The court imposed sentence as follows:  (1) 25 years to life for count 1, plus 25 years to life for the firearm enhancement on that count; (2) life with the possibility of parole for count 2, plus 25 years to life for the firearm enhancement on that count; (3) three years for count 5, plus two years for the prior-prison-term enhancements; and (4) eight months for count 6.  The sentences on counts 3 and 4 and on the remaining enhancements were stayed pursuant to section 654.

## DISCUSSION

### I.    *Griffin and Doyle*

#### A.    *Background*

Patino argues that, during the prosecutor's cross- and recross-examinations of Patino, the prosecutor violated the rules of *Griffin* and *Doyle* by asking Patino about his prior silence.  Patino further contends the prosecutor's references to these matters in closing arguments compounded the error.

During cross-examination, the prosecutor asked a series of questions about when Patino first told police or anyone else the alleged facts on which his claim of self-defense was based, specifically the facts that Williams had a gun and that Patino got the gun he used from Diaz.  Patino testified that he did not tell the police, or anyone but his lawyer, until he testified at trial.

On redirect, defense counsel asked Patino whether the trial was his first opportunity to tell his story under oath.  Patino said yes.

To rebut this, on recross-examination, the prosecutor asked Patino whether he was present at and testified at his preliminary hearing.  Patino answered that he was present but did not testify.

Defense counsel conducted further redirect and asked Patino whether he knew he could testify at the preliminary hearing.  Patino said, "Oh, naw, I didn't want to testify."

Later in the day, after Patino had completed his testimony, defense counsel placed on the record an objection based on *Griffin:*  "During the course of cross-examination, Counsel was continuing to ask my client with regards to issues of whether or not he

5.

testified or told anyone his story. And, I believe, it was borderline Griffin [e]rror and that's the only concern I had, and I wanted to note that for the record." The court stated that the objection was noted.

In closing argument, the prosecutor implied that Patino's story was not credible because (among other reasons) he did not tell it until after he heard other witnesses' accounts: "He sat through the whole trial and listened to every bit of the testimony, had about two days to get on it and think about it and then he testified."

After the verdict, Patino made a motion for a new trial, asserting *Griffin* error. Patino's brief in support of the motion did not mention *Doyle* by name, but it did refer to improper questioning regarding Patino's post-*Miranda*[2] silence, which, as will be seen, is the definition of *Doyle* error.

In its oral ruling denying the motion, the trial court discussed both potential *Griffin* error and potential *Doyle* error. The court never ruled on whether either type of error was committed. It conceded that the jury was asked to consider, and could have been influenced by, the facts that Patino did not tell his story to the police and did not testify about it at the preliminary hearing. In connection with *Doyle*, the court said, "I don't know if he was ever Mirandized," a question which, as we will explain, is pertinent to the applicability of *Doyle*. Regarding *Griffin*, the court observed that the situation was unusual in that there was comment on Patino's failure to testify at the preliminary hearing—not at trial, where he did testify. It pointed out that the prosecutor's question about testifying at the preliminary hearing was asked in response to defense counsel's prior question about whether Patino had any chance before trial to tell his story under oath; it described this as "fair questioning." Finally, the court concluded that any error was harmless because the evidence of Patino's guilt was "very strong."

---

[2]*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

6.

### B. *Doyle*

The defendants in *Doyle* were convicted of selling marijuana to a government informant. Their defense was that they were really trying to *buy* the marijuana from the informant and he framed them by throwing the money into their car and claiming the marijuana in his possession came from them. (*Doyle, supra*, 426 U.S. at pp. 611-613.) When cross-examining the defendants, the prosecutor impeached them, over defense objections, by eliciting the fact that the defendants, who had been read their *Miranda* rights, did not tell this story to the police. (*Doyle, supra,* at pp. 613-614.) The United States Supreme Court held:

> "[Miranda requires] that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these Miranda rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested…. Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. [¶] … [¶] We hold that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." (*Doyle, supra*, 426 U.S. at pp. 617-619, fn. omitted.)

The People argue that Patino forfeited this issue because neither his objection during the trial nor his new trial motion mentioned *Doyle*. We do not agree. The new trial motion did mention the substance of *Doyle*, although it did not cite the case. The trial court's discussion of *Doyle* in its oral ruling on the motion makes it clear that the court understood Patino to be raising the *Doyle* issue. Further, in the objection counsel made during trial, he referred to "issues of whether or not he testified or told anyone his story." Again, counsel cited only *Griffin*, but the substance of his objection—that it was improper to question Patino about whether he testified *or told anyone*, also raised the

7.

*Doyle* issue. The People also argue that defense counsel's objection during the trial came too late because Patino had already finished testifying; but there is no merit in this contention, since the court could still at that stage have admonished the jury not to consider Patino's prior silence.

No *Doyle* error has been shown, however. The holding of *Doyle* is that it is unfair to advise a defendant of his right under *Miranda* to remain silent, and then turn around and use his silence as evidence against him. The question of whether postarrest silence can be used to impeach a defendant who was *not* Mirandized was addressed in *Fletcher v. Weir* (1982) 455 U.S. 603 (*Fletcher*). Weir was convicted of murder; his defense, which he revealed for the first time at trial, was self-defense. The prosecutor questioned him about why he had not claimed self-defense when arrested. After the state supreme court affirmed his conviction, a federal district court issued a writ of habeas corpus, holding that *Doyle* applied even though the record did not show that the police read Weir his *Miranda* rights. (*Fletcher, supra,* at pp. 603-604.) The United States Supreme Court reversed:

> "The significant difference between the present case and *Doyle* is that the record does not indicate that respondent Weir received any *Miranda* warnings during the period in which he remained silent immediately after his arrest.… [¶] … [¶] In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand. A State is entitled, in such situations, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony." (*Fletcher, supra*, 455 U.S. at pp. 605-607.)

The California Supreme Court cited *Fletcher* in *People v. Medina* (1990) 51 Cal.3d 870, 890 (*Medina*). Medina was convicted of three murders. (*Id.* at p. 878.) His sister visited him in jail before trial and asked him why he did it. He was silent initially, then made remarks that did not deny his guilt. The trial court admitted evidence of this conversation as an adoptive admission. On appeal, Medina argued that this application of

8.

the adoptive-admissions rule contravened *Doyle* as it allowed the prosecution to use his postarrest silence against him. The California Supreme Court stated that the record did not show that Medina was Mirandized and that, even if he had been, the record did not support an inference that his silence in response to his sister's question was intended as an invocation of his right to remain silent. (*Medina, supra*, at pp. 889-891.)

In this case, the record does not show whether Patino was Mirandized at the time when he maintained his silence to the police or at any other time. *Fletcher* is directly on point and means that no constitutional violation has been established.

Patino cites *People v. Galloway* (1979) 100 Cal.App.3d 551, a case from this court predating both *Fletcher* and *Medina*. *Galloway* is not controlling. The defendant in that case, who was convicted of robbery, claimed *Doyle* error because the prosecutor questioned him about why he never mentioned his alibi to anyone before he gave testimony at trial. (*Galloway, supra*, at pp. 554, 556.) The issue this court resolved was whether *Doyle* was limited to silence during police questioning; we held that it was not. The opinion did not discuss whether Galloway was Mirandized or not. (*Galloway, supra*, at pp. 557-558.) The case therefore does not stand for the proposition that *Doyle* applies to cases in which the record fails to show that the defendant was read his rights. If it did, it would have been superseded by *Fletcher*.

### C. *Griffin*

In *Griffin*, a California case, the defendant was convicted of murder and sentenced to death. (*Griffin, supra,* 380 U.S. at pp. 609, 611.) In the guilt phase of trial, he did not testify. (*Id.* at p. 609.) In closing arguments, the prosecutor emphasized the defendant's failure to testify, asserting that only he could explain the incriminating circumstances, yet he withheld his knowledge from the jury. (*Id.* at pp. 610-611.) The trial court gave the jury an instruction, consistent with the law of California at the time, that unfavorable inferences could properly be drawn from the defendant's failure to testify and explain or deny evidence against him concerning matters within his knowledge. (*Id.* at p. 610.)

9.

The United States Supreme Court held that allowing a prosecutor to comment on, and a jury to consider, a defendant's failure to testify violates the Fifth Amendment's self-incrimination clause. (*Griffin, supra,* 380 U.S. at pp. 611-613.) "[C]omment on the refusal to testify is a remnant of the 'inquisitorial system of criminal justice,' [citation], which the Fifth Amendment outlaws. It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly." (*Id.* at p. 614, fn. omitted.)

In this case, the only references made at trial to a failure to testify were the questions and Patino's answers about whether he testified at the preliminary hearing. The potential *Griffin* error is confined to these references. The other references to Patino's silence fall under the rubric of potential *Doyle* error, as discussed above.

The People contend that Patino has forfeited the *Griffin* issue because he did not make a *Griffin* objection during his testimony. We disagree. Patino did make a *Griffin* objection shortly after he finished testifying, when it was not too late to admonish the jury not to use against him his failure to testify at the preliminary hearing. Patino also based his new trial motion on *Griffin.*

There is another reason, however, why we will not address the merits of the *Griffin* issue. As the People point out in their brief—and as the trial court also pointed out when it denied the new trial motion—it was defense counsel who first raised the question of whether the trial was Patino's first opportunity to tell his story under oath. Patino's affirmative answer was not correct: He could have made his claim of self-defense under oath at the preliminary hearing. The question of whether Patino testified at the preliminary hearing "became pertinent," as the People contend, when defense counsel raised the issue of a prior chance to claim self-defense under oath. The error, if any, of allowing the prosecutor to question Patino about whether he testified at the preliminary hearing was, therefore, an invited error.

A party is estopped from asserting as a ground for reversal any error induced or invited by his or her own conduct. (*Kardly v. State Farm Mut. Auto. Ins. Co.* (1995) 31

10.

Cal.App.4th 1746, 1750; *Abbott v. Cavalli* (1931) 114 Cal.App. 379, 383.) In criminal cases, this doctrine applies where "[d]efense counsel [is] deemed to have intentionally caused the claimed 'error.'" (*People v. Marshall* (1990) 50 Cal.3d 907, 931.)

Here, the prosecutor on cross-examination asked Patino whether he had told his story to police or anyone else before trial. This has not been shown to be *Doyle* error for the reasons we have discussed. Defense counsel sought to blunt the effect of Patino's negative answer by asking whether there had been any pretrial opportunity to tell the story under oath. Since Patino answered this question—and answered it incorrectly—we can only conclude that the prosecutor's follow-up question about the preliminary hearing was invited by the defense tactic. It follows that Patino is estopped from asserting as a ground for reversal any *Griffin* error that might have been involved in the prosecutor's question or the prosecutor's reference, in closing argument, to Patino's answer.

## II.     *Lesser-included offense/double jeopardy*

The death of the victim was an element of murder. It also was an element of the enhancement under section 12022.53, subdivision (d), which requires a finding of use of a firearm resulting in great bodily injury or death. Patino argues that the use of the same fact to support conviction and punishment under these two provisions amounted to conviction and punishment for both a greater and a lesser-included offense and violated double-jeopardy principles.

Patino's argument is inconsistent with the California Supreme Court's decisions in *People v. Izaguirre* (2007) 42 Cal.4th 126, 130-134 and *People v. Sloan* (2007) 42 Cal.4th 110, 115-125. We are, of course, not free to reach conclusions contrary to holdings of our Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Patino acknowledges this, stating that he raises the issue only to preserve it for review in subsequent proceedings.

## III.     *Mathematical error in custody credits*

At sentencing, the trial court granted Patino 410 days of custody credit, consisting of 410 days actually served. The parties agree that the correct count, which includes both

11.

the day of arrest and the day of sentencing, as well as February 29, 2012, is 411 days. Patino's appellate counsel wrote a letter to the trial court asking that the error be corrected; the trial court, apparently miscalculating, replied by letter, stating that no correction was necessary. Our own calculation confirms that 411 days is the correct figure. We will order a correction.

### ***DISPOSITION***

The trial court is directed to correct the abstract of judgment to show that Patino is entitled to 411 days of presentence custody credit, not 410, and to forward the corrected abstract to the appropriate correctional authorities. The judgment is otherwise affirmed.

_____
Oliver, J.[*]

WE CONCUR:


_____
Poochigian, Acting P.J.


_____
Peña, J.

---

[*]Judge of the Superior Court of Fresno County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.